IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 9, 2020 Session

**STATE OF TENNESSEE v. DAQUAN H. FIELDS**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-B-1148     Cheryl A. Blackburn, Judge**

———————————————

**No. M2020-00109-CCA-R3-CD**

———————————————

A jury found Defendant, Daquan H. Fields, guilty of felony murder, aggravated robbery, and reckless homicide. The reckless homicide conviction merged with the felony murder conviction, and Defendant received a life sentence. Defendant received a twelve-year sentence for the aggravated robbery conviction, to be served consecutively to the life sentence. On appeal, Defendant argues that the evidence was insufficient to sustain his convictions. Defendant further argues that the trial court erred in ordering his twelve-year sentence for aggravated robbery to be served consecutively to the life sentence. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Daquan H. Fields.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela S. Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 4, 2016, Defendant and co-defendant, Savion Wilson, robbed the Mapco on Donelson Pike while Defendant was armed with a gun. After he exited the Mapco, Defendant turned and shot at a Krispy Kreme delivery truck eight times because the driver, Al Baker, witnessed the robbery. One of the bullets pierced the cab of the truck, struck Mr. Baker, and killed him. The Davidson County Grand Jury indicted

Defendant and co-defendant Wilson for first-degree felony murder, aggravated robbery, and first-degree premeditated murder. Defendant and co-defendant Wilson were severed for separate trials.

At Defendant's trial, the victim's wife testified that she and the victim were married for nineteen years. The victim was employed by Krispy Kreme for thirty-one years, and he was set to retire the upcoming year. The victim was not scheduled to deliver the night he was killed but went in because a co-worker called out sick.

Timothy Rhodes worked as a store clerk at the Mapco located on Donelson Pike on the night of the robbery. He generally worked the overnight shift by himself. The earlier shifts normally had two or more people working. There were two entrances to the store, and during his shift one of the doors was locked so it was easier to keep watch on people who entered or exited the store. The store was equipped with surveillance cameras and an alarm.

On the night in question, Mr. Rhodes saw Defendant enter the store wearing a blue hoodie and some type of mask that covered his face. Defendant locked the door behind himself and pulled out his gun. Defendant went behind the counter and confronted Mr. Rhodes. Defendant told Mr. Rhodes to put the money from the cash register into a bag or he was going to shoot him. Mr. Rhodes did as Defendant demanded. Defendant then told Mr. Rhodes to open the safe. Mr. Rhodes informed Defendant that the manager was the only person who could open the safe and that he was not the manager. Defendant took the rolled coins that were stacked on top of the safe and put them in the bag. Defendant instructed Mr. Rhodes to open the second cash register and give him everything in it. Defendant explicitly directed Mr. Rhodes not to put "that two-dollar bill in [the] bag, or [Defendant will] shoot [Mr. Rhodes] dead." Mr. Rhodes explained that the two-dollar bill was used in the stores as a type of robbery tracking mechanism. Defendant then took Mr. Rhodes's wallet and exited the store using the same door through which he entered.

During the robbery, Mr. Rhodes saw a Krispy Kreme truck drive by the store. About ten seconds after Defendant left the store, Mr. Rhodes heard about eight or nine gunshots. After he heard the gunshots, Mr. Rhodes ducked down inside the store where he could not be seen. He waited a while, locked the door, proceeded to lock himself inside the manager's office, and called the police. After the police officers arrived, Defendant contacted his manager, and the store's surveillance camera footage was made available to the police. Mr. Rhodes was not able to identify Defendant because of the hoodie and mask that Defendant wore. Mr. Rhodes only saw Defendant's eyes and the bridge of his nose.

David Moore was friends with Andrew Anderson and Defendant. He recalled that Defendant called him to pick up Defendant at the InTown Suites on the night of the robbery. Upon arrival, Mr. Moore noticed that something was on fire in the back of the parking lot next to a box truck. He could not identify what was burning. "Sosa," later identified as Chris Jenkins, was with Defendant when Mr. Moore picked him up. Mr. Moore was driving a small two or three passenger Mazda pickup truck. Mr. Moore drove the three of them to Walmart. Defendant asked Mr. Moore for ten dollars to buy a new hoodie. Mr. Moore had loaned Defendant his hoodie the previous month and asked Defendant what happened to his hoodie. Defendant told Mr. Moore that "he didn't want to know." According to Mr. Moore, only he and Defendant left Walmart in the truck.

Defendant called Mr. Anderson on Mr. Moore's phone. During the phone conversation, Mr. Moore overheard Mr. Anderson tell Defendant "that [Defendant] had caught a body." Defendant pulled up a link of the Mapco robbery on Mr. Moore's phone and saw that the Krispy Kreme driver had been killed. Defendant then asked Mr. Moore if he was "going to be solid for him" and keep his "mouth shut." Mr. Moore dropped Defendant off at the InTown Suites and never socialized with him again. Mr. Moore recalled that after a day or two he told his father about what happened with Defendant. They contacted Crimestoppers and relayed Defendant's name, location, and Facebook information. Defendant tried contacting Mr. Moore through Facebook, but Mr. Moore did not respond. Mr. Moore eventually misled Defendant into believing that his father took a job out of state and that he was moving. Mr. Moore identified Defendant for police from a surveillance photograph from the Mapco. The photograph showed Defendant wearing Mr. Moore's hoodie. Because Defendant had "very distinct eyebrows," Mr. Moore recognized and identified Defendant in the photograph even though Defendant's entire face was not visible.

Destiny Amos, Mr. Anderson's girlfriend, resided in Murfreesboro. She was with Mr. Anderson on December 3, 2016 before he went to Nashville to go to a "birthday thing with his friends." The birthday gathering was for Defendant. She picked up Mr. Anderson around midnight, and they returned to Murfreesboro. She was unaware if Mr. Anderson made or received any phone calls after they returned to Murfreesboro.

Xavier King was with Defendant at the InTown Suites for the birthday gathering. While at the gathering, he saw others pass around a gun that belonged to Mr. Anderson. He identified the gun as a black 9mm High Point. Mr. King heard Defendant say that "he was gassed up[,] and he wanted to catch a body."

A few days later, Mr. King picked up Defendant and Mr. Jenkins at InTown Suites. Defendant told Mr. King that he thought he "caught a body." Defendant later told Mr. King about robbing the Mapco and that he "just started shooting" and that if he

killed someone it was an accident. Defendant told Mr. King that he got about twenty-five dollars from the robbery. Defendant also told Mr. King that co-defendant Wilson was involved in the robbery as well.

Co-defendant Wilson testified that he had known Defendant for a couple of years. He identified Defendant in the courtroom for the jury. According to co-defendant Wilson, Defendant came to an apartment at Nashboro Village after his birthday gathering. When Defendant arrived, he was wearing a blue Nike hoodie and had a 9mm High Point gun in his possession. Defendant called co-defendant Wilson asking if he knew of any "licks," meaning places to rob. At approximately 12:30 a.m., co-defendant Wilson and Defendant rode around in co-defendant Wilson's gray Nissan Maxima. The two were looking for a store to rob. Co-defendant Wilson drove his car. Defendant eventually told co-defendant Wilson to pull over at the Mapco on Donelson Pike. Co-defendant Wilson parked behind the Mapco in an adjacent parking lot. Defendant got out of the car and "started sticking up the place." According to co-defendant Wilson, a large Krispy Kreme delivery truck was at the gas pump at the Mapco.

Co-defendant Wilson saw Defendant exit the Mapco. As he proceeded to pick up Defendant, co-defendant Wilson heard gunshots. Co-defendant Wilson saw the Krispy Kreme truck slowly rolling after he heard the gunshots. He began to drive away without picking up Defendant. Eventually, co-defendant Wilson stopped, and Defendant got in the car. Defendant had a covering over his head and face and wore gloves.

At the end of the night, co-defendant Wilson retrieved the gun from Defendant and dropped him off at the InTown Suites. Co-defendant Wilson returned the gun to Mr. Anderson. Co-defendant Wilson identified a Facebook conversation with Curtis Baker on December 6, 2106, that referenced the Krispy Kreme murder. Mr. Baker asked if it was "Loco or Drew" who committed the murder, and co-defendant Wilson responded Loco. Co-defendant Wilson recalled that Defendant went by the nickname "Loco."

Mr. Jenkins was a longtime friend of Defendant. He was with Defendant, Mr. Anderson, Mr. King, and others at Defendant's birthday gathering at InTown Suites. Mr. Jenkins saw a 9mm High Point gun at the gathering. At some point, Mr. Jenkins left the gathering and went home. The next day, Mr. Jenkins met with Defendant. Defendant had a plastic bag containing a blue hoodie with orange writing, and the bag smelled of bleach. Defendant burned the hoodie in the parking lot of InTown Suites. They were later picked up by Mr. Moore in a small pickup truck and went to Walmart. While in the truck, Defendant received a phone call from Mr. Anderson. Mr. Anderson told Defendant that he owed Mr. Anderson a weapon because of the murder. Defendant told Mr. Anderson that he did not mean to shoot the victim. Defendant stated that he might have to get a teardrop tattoo. Mr. Jenkins remained with Defendant for most of the day.

- 4 -

Defendant joked about the murder and stated "man, I hit the news." Defendant spoke to Mr. Jenkins about his "street cred" after the murder. Defendant repeatedly told Mr. Jenkins and others that he "caught a body."

At some point, Mr. Jenkins was in the car with Defendant and Defendant's mother when the murder was discussed. According to Mr. Jenkins, Defendant's mother suggested that the murderer was Mr. Anderson, but Defendant stated "mama, I did it, everybody's got a body." Mr. Jenkins saw photographs of the murderer on the news and recognized Defendant because of his eyebrows. Defendant's mother gave Defendant money to leave town.

Mr. Jenkins confirmed Defendant's nickname was "Loco." Defendant told Mr. Jenkins to act as his alibi and tell police that they were in Florida at the time of the murder.

Defendant gave a voluntary statement to police. He acknowledged that he once worked for Mapco but denied being involved in the robbery and shooting. Defendant claimed he was with Mr. Jenkins, a claim which Mr. Jenkins denied.

Police found eight 9mm bullet casings on the ground at the crime scene. The casings were fired from the same weapon. The pistol used in the shooting was recovered during an investigation of an unrelated crime. A picture of a pistol was found on Mr. Anderson's cell phone. The picture was taken several days before the robbery and shooting. The serial number on the recovered pistol matched the serial number on the pistol in the picture from Mr. Anderson's cell phone. Additional testing showed the gun was the one used in the murder of the victim. Co-defendant Wilson's car matched the appearance of the car in the surveillance video around the crime scene. Cell phone records placed co-defendant Wilson's cell phone in the general area around the crime scene at the time of the robbery and shooting.

Defendant waived his right to testify and offered no proof.

After hearing the proof, the jury found Defendant guilty of first-degree felony murder, aggravated robbery, and the lesser-included offense of reckless homicide. At the subsequent sentencing hearing, the trial court found that Defendant had a history of prior criminal behavior as an enhancement factor. The trial court further found additional enhancement factors in that Defendant acted as the leader in the commission of the offense and that Defendant used a special skill as a former employee of Mapco "that significantly facilitated the commission or the fulfillment of the offense." The trial court stated that "he did use the inside information." The trial court found no mitigating factors. The State presented a prepared judgment form that indicated the reckless

homicide conviction merged with the first-degree felony murder conviction, thus the trial court did not fashion a sentence for Count 3.[1]  Defendant received a life sentence for the first-degree felony murder conviction and a twelve-year sentence for the aggravated robbery conviction, to be served consecutively to the life sentence.

Defendant timely filed a motion for new trial.  Defendant argued that the evidence was insufficient to sustain his convictions.  Defendant also agued that the trial court erred by ordering the twelve-year sentence to be served consecutively to his life sentence.  After a hearing, the trial court denied the motion for new trial.  It is from that denial that Defendant now appeals.

*Analysis*

Defendant argues that the evidence is insufficient to sustain his convictions and that the trial court erred in ordering his twelve-year sentence for aggravated robbery to be served consecutively to his life sentence for first-degree felony murder because aggravated robbery, as the "underlying felony," was an essential element of the first-degree felony murder.  The State argues that the evidence is sufficient to sustain Defendant's convictions and that the trial court did not err by imposing consecutive sentences.  We agree with the State.

### I.      Sufficiency of Evidence

Defendant specifically argues that the evidence was insufficient as a matter of law for any rational jury to find him guilty beyond a reasonable doubt because his identity was not proven.  The State argues the evidence was sufficient.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence.  A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt.  *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On appeal, "the State is entitled to the strongest legitimate view of the

---

[1] We note the judgment form for Count 3 only indicates the count has "merged with Count 1" and "no sentence."  "[T]he best practice is for the trial court to impose a sentence on each count and reflect the sentence on the respective uniform judgment document."  *State v. Berry*, 503 S.W.3d 360, 365 (Tenn. 2015).  In the event the greater conviction is reversed, it avoids the necessity of an additional sentencing hearing.  *Id.*

evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-13-202(a)(2), in pertinent part, defines first-degree murder a s a killing of another committed in the perpetration of a robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Aggravated robbery is robbery "accomplished with a deadly weapon." *Id.* § 39-13-402(a)(1). "Reckless homicide is a reckless killing of another. *Id.* § 39-13-215(a). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(2)(a). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-302(b). "'Reckless' refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 39-11-302(c).

Here, it is undisputed that there was indeed a robbery and a shooting that resulted in the death of the victim. Defendant contends that the robbery victim could not identify Defendant. He further claims the only proof of his identity as the perpetrator was the uncorroborated testimony of the co-defendant. However, multiple witnesses testified they saw Defendant with the gun prior to the murder. Mr. Jenkins testified he was present when Defendant told his mother that he committed the murder. Defendant tried to persuade Mr. Jenkins to be his alibi. Mr. Moore and Mr. Jenkins both identified Defendant from surveillance photographs and pointed out his distinctive eyebrows. Mr. Moore and Mr. Jenkins were both with Defendant when he received a phone call about the Mapco robbery, and he looked up the news report online. Mr. Moore identified the hoodie that Defendant wore in surveillance photographs as one he lent Defendant. Mr. Jenkins testified he saw the hoodie in a bag before Defendant lit it on fire in the parking

lot of InTown Suites after the robbery. Mr. Jenkins, Mr. King, and Mr. Moore all heard Defendant talk about how he "caught a body." The gun used in the shooting belonged to Mr. Anderson. Co-defendant Wilson gave it back to Mr. Anderson after the shooting. Mr. Jenkins was in the car with Defendant as he spoke on the phone with Mr. Anderson. Mr. Anderson told Defendant he owed him a new gun because Defendant used Mr. Anderson's gun during the robbery and shooting. When reviewing the evidence in the light most favorable to the State, we conclude that a rational juror could have found beyond a reasonable doubt that Defendant robbed the Mapco and Mr. Rhodes and shot and killed the victim. Defendant's involvement and identity is amply corroborated by overwhelming evidence and the testimony of multiple witnesses. Defendant is not entitled to relief.

## II.  Consecutive Sentencing

Defendant contends that the trial court erred in ordering Defendant to serve the sentence for aggravated robbery consecutively to the automatic life sentence for the felony murder conviction. Defendant specifically contends, "the underlying felony is an essential element" in all cases of felony murder cases and to run the sentence for the underlying felony" consecutively to the sentence for felony murder acts to enhance Defendant's sentence with an element of the offense in violation of Tennessee Code Annotated section 40-35-114. The State argues that neither the sentencing statutes nor caselaw prohibits consecutive sentencing under the circumstances. We agree with the State.

As an initial matter, the minimum mandatory sentence for first-degree felony murder is a life sentence. T.C.A. 39-13-202(c). The offense is without felony classification and thus without range. A life sentence is a fixed term and cannot be enhanced or mitigated. At the sentencing hearing, the trial court recognized the mandatory sentence for Count 1 and noted that aggravated robbery "is the only thing I am sentencing on today."

In fashioning Defendant's sentence for aggravated robbery, the trial court considered the requirements of Tennessee Code Annotated section 40-35-210 before imposing a sentence. The trial court found that enhancement factors one, two, and fourteen applied in the sentencing for Defendant's *single* aggravated robbery conviction. T.C.A. § 40-35-114(1), (2), & (14). The trial court found no applicable mitigating factors. T.C.A. § 40-35-113. Defendant does not appeal the use of any advisory factors used by the trial court to sentence him. *See* T.C.A. § 40-35-114. The trial court sentenced Defendant as a Range I, standard offender, to an appropriate, within range, sentence of twelve years for aggravated robbery.

Regarding Defendant's *multiple* convictions, the trial court found that Defendant is a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," making the appropriate *Wilkerson* findings, and ordered Defendant's sentences to be served consecutively to each other. *See* T.C.A. § 40-35-115(b)(4); *State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995).

Defendant argues that because the underlying felony, here aggravated robbery, is an essential element of the felony murder offense, the underlying felony cannot be used as an enhancement factor for the felony murder sentence, citing the introductory language to Tennessee Code Annotated section 40-35-114.

If appropriate for the offense and if not already an essential element of the offense, the court shall consider, but is not bound by, the following advisory factors in determining whether to enhance a defendant's sentence:

Defendant provides no authority, other than the statute itself, to support this argument. This argument seems to be an attempt to twist this language from Tennessee Code Annotated section 40-30-114, which has nothing to say about consecutive sentencing, into language from Tennessee Code Annotated section 40-35-115, which has much to say about sentence alignment for multiple convictions. Put another way, Tennessee Code Annotated section 40-30-114 addresses enhancement factors for *singular offenses* while Tennessee Code Annotated section 40-30-115 addresses enhancement requirements for the alignment of sentences for *multiple convictions*. The statutes are not in conflict and thus no statutory construction analysis is needed

The Tennessee Supreme Court has long held that neither the Tennessee General Assembly nor the constitution prohibits dual convictions and punishment for felony murder and the underlying felony. *See State v. Godsey*, 60 S.W.3d 759, 778 (Tenn. 2001); *State v. Blackburn*, 694 S.W.2d 934, 936-37 (Tenn. 1985). As an intermediate appellate court, we are bound by Tennessee Supreme Court precedent. *State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999). Sentencing for multiple offenses is governed by Tennessee Code Annotated section 40-35-115. Because the trial court found Defendant to be a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," the court had the discretionary authority to impose consecutive sentences. T.C.A. 40-35-115(b)(4); *State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013) (applying the abuse of discretion with a presumption of reasonableness standard set forth in *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012), to consecutive sentencing).

The issue is without merit. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE